McDaniel *v.* Forrest Park Cemetery Company.

Opinion delivered January 22, 1923.

1. Nuisance—cemetery.—A cemetery is not a nuisance *per se,* and ordinarily courts of equity will not interfere but will leave the complainants to an action at law, unless it clearly appears that a nuisance will be brought into existence by the acts of the parties sought to be restrained.

2. Nuisance—cemetery.—When it appears that a place of sepulture is so situated that the burial of the dead there will endanger life or health by corrupting either the surrounding atmosphere or the water of wells or springs, the court will grant its injunctive relief, upon the ground that the remedy at law is inadequate.

3. Nuisance—cemetery.—Evidence *held* insufficient to enjoin the establishment of a cemetery.

Appeal from St. Francis Chancery Court; *A. L. Hutchins,* Chancellor; affirmed.

*Hughes & Hughes,* for appellant.

The case rests upon the proposition that the cemetery will necessarily be a nuisance to appellant. This court has defined a private nuisance as "anything that works a hardship or annoyance to the lands of another." 18 Ark. 252. See also, 92 Ark. 538; 85 Ark. 552; 102 Ark. 290; 116 Ark. 386. Equity will enjoin the use of land as a cemetery where it appears with reasonable certainty that the burial of dead bodies there will injure life or health by corrupting the water of wells of adjoining landowners. 5 R. C. L. 236; 34 L. R. A. (N. S.) 565; 46 L. R. A. 237; 131 Iowa 169; 109 N. W. 203; 190 Ill. App. 455; 82 N. Y. S. 973; 59 N. C. 83; 79 Am. Dec. 241; 159 Ill. 385.

*Mann & Mann,* for appellee.

1. A cemetery is not a nuisance *per se.* 5 R. C. L. 234, 235; 174 Pac. 961; 1 A. L. R. 541. See also 95 Ark. 545. To sustain his action there must have been clear proof on the part of the appellant of a strong probability that the use of the land as a cemetery will poison the wells on his property to such an extent as to endanger the health and lives of persons using water

from them. Mere diminution in value of the property is not sufficient. 102 Ark. 290.

2. Injunction will not be granted upon the mere ground of proximity of a cemetery and consequent depreciation in value of plaintiff's property, or that its proximity would cause unpleasant reflections. 111 Pac. 392, 31 L. R. A. (N. S.) 945; 69 Neb. 300; 5 A. & E. Ann. Cas. 132.

3. The chancellor's findings will be sustained unless they are clearly contrary to the preponderance of the evidence. 87 Ark. 537; 101 Ark. 522; 105 Ark. 512. See also 72 Ark. 305; 75 Ark. 52; Id. 72; 90 Ark. 426; 96 Ark. 171; 143 Ark. 319.

SMITH, J. This is a suit to enjoin the use of a certain tract of land as a cemetery. Appellant McDaniel owns two tracts of land just south of the city of Forrest City. One of them is the southeast quarter of section 4, the other the south half of the northeast quarter of section 9, township 4 north, range 3 east. The cemetery tract is the north half of the northeast quarter of section 9, township 4 north, range 3 east, lies between the two tracts above described. Practically all of the land in all three tracts is in cultivation.

Appellant alleges that appellee is threatening to use the middle tract as a cemetery; that he has numerous wells of water on his land for drinking purposes, and that, on account of the slope of the land and the porous character of the soil, the water will soak through the land from the graves to appellant's wells and poison them, and make the water injurious to health and life. The answer alleged the intention to use only ten acres of the land for immediate cemetery purposes, and denied that the burial of dead bodies in the land would poison the wells of appellant and make the water injurious to health and life.

The case presented is an interesting one, and was tried with great care and skill, and scientists of national reputation were called as witnesses on both sides.

The law of the subject appears to be very well settled. The annotated cases of *Nelson* v. *Swedish, etc, Cemetery Assn.,* 111 Minn. 149, 126 N. W. 723, 127 N. W. 626, 34 L. R. A. (N. S.) 565; *Lowe* v. *Prospect Hill Cemetery Assn.,* 58 Neb. 94, 78 N. W. 488, 46 L. R. A. 237, and *Rea* v. *Tacoma Mausoleum Assn.,* 103 Wash. 429, 174 Pac. 961, 1 A. L. R. 541, cite the leading cases on the subject. See also cases cited in briefs of counsel. and authorities cited in the notes to the text in 5 C. J. 56 and 5 R. C. L. 236. The law of the case is summarized in 5 R. C. L. 235 as follows: "As public cemeteries for the orderly and decent sepulture of the dead are necessary requirements for all populous communities, private convenience must yield to the convenience of the public in fixing sites for them, and the courts should be particularly careful not to interfere to prevent such establishments, unless the mischief be undoubted and irreparable. The decided weight of authority may be said to be to the effect that a cemetery is not *per se* a nuisance, and ordinarily in such cases courts of equity will not interfere, but will leave the complainants to an action at law, unless it clearly appears by competent evidence that a nuisance will be brought into existence by the acts of the parties sought to be restrained, and that the party complaining will be injured unless the injunction is granted. Whether a place of interment of the dead is a nuisance depends on the position and extent of the grounds, and especially on the manner in which the burials are effected. If the grounds be arranged and drained, and the burial of the dead be conducted in a proper manner, it will not be a nuisance, either public or private. The unpleasant reflections suggested by having before one's eyes constantly recurring memorials of death is not such a nuisance as will authorize the intervention of equity. It is well settled, however, that it is within the province of a court of equity to restrain the location or maintenance of a cemetery which will endanger the public health or operate as a nuisance. Accordingly, when it appears that a place

of sepulture is so situated that the burial of the dead there will endanger life or health, by corrupting either the surrounding atmosphere or the water of wells or springs, the court will grant its injunctive relief, upon the ground that the act will be a nuisance of a kind likely to produce irreparable mischief, and one which cannot be adequately redressed by an action at law.''

The parties agree that this is a correct statement of the law as declared in the adjudicated cases, and it becomes therefore a question of fact whether the landowner has made a case entitling him to enjoin the establishment of the proposed cemetery.

On behalf of the cemetery association it is insisted, first, that the soil of the cemetery tract to a depth of twelve to fifteen feet is practically impervious to the passage of water; second, that the slope of the ground is such that no water from the cemetery will reach the wells on plaintiff's property; third, that if the water from the cemetery should reach the wells it would be so purified that it would not be dangerous to health for one to drink from the wells.

The testimony is in hopeless conflict as to the porosity of the soil. Dr. Tucker, who is professor of geology at the University of Indiana and a specialist in hydrology, spent three and one-half days making tests of the soil. He made tests of the soil both on the ground and in his laboratory, and he testified that to a depth of ten to fifteen feet the soil was as impervious to water as any he had ever examined, and he expressed the opinion that there was no underground drainage at that depth, and that there was absolutely no danger of contamination to wells situated on adjoining property. He further testified that, after an examination and study of the soil, as well as a study of the books and pamphlets of other geologists covering the soil of that section, he had concluded that the soil covering the cemetery tract was ''hill drift,'' that is, a soil which had drifted down from Crowley's Ridge, and in its transportation thereto the

soil had been exposed to weathering processes which had produced a clay practically impervious to water.   He testified that trees and growing crops gather moisture in such soil by capillary attraction, which is a microscopic movement in a horizontal direction, and this movement has nothing to do with the movement of underground waters.   This witness devoted more time to the examination of the soil than did any other expert witness who testified on that subject.

Dr. Glenn, professor of geology at Vanderbilt University, and Dr. Drake, professor of that science at the University of Arkansas, testified in behalf of the plaintiff; and the same wide difference of opinion on the part of the experts was found here as exists in all other cases where witnesses are called to testify as experts.   It was the opinion of Dr. Glenn and Dr. Drake that there was a movement of subsurface waters from the cemetery tract towards the lands of plaintiff which would contaminate his wells if dead bodies were buried in the cemetery tract; and it was their opinion that the use of steel coffins, hermetically sealed, would only delay this injury, as in the course of time steel coffins would be eaten through with rust and the entire contents set free.   It was their opinion that bacteria live and travel in subsurface waters, and that plaintiff's wells would be poisoned thereby if the land in question was devoted to use as a cemetery.

The plaintiff himself, two neighboring farmers, a grave digger, and a tenant who had put water in test water-holes, gave testimony tending to show that there was in fact a subsurface movement of water in harmony with the slope of the surface, and that the underground water probably moved at the rate of from five to fifteen feet per day.

M. Z. Bair, who is the chief sanitary engineer of the Arkansas State Board of Health, made an examination of the proposed cemetery, and testified that the character of the soil was such that it was impervious to water, and

that it would be impossible to detect any contamination of the water in wells on plaintiff's land by accepted methods of analysis, by reason of the burial of the dead in the cemetery tract.

Two non-expert witnesses gave testimony as to certain facts within their observation confirmatory of the opinions of the experts who testified in behalf of the defendant. The conflict in the testimony of the experts as to the imperviousness of the soil is such that we should be left in much doubt about the merit of the cause if the decision had to be made without the consideration of any other testimony.

Mr. Herring, a drainage engineer, made a survey of the lands in question, and exhibited with his testimony topographical maps which he had made showing the surface drainage of the cemetery tract. He testified that the drainage of the east forty acres of the cemetery tract is directly west, and that water thus drained would escape plaintiff's lands, which lie north and south of the cemetery tract; and that the drainage of the west forty acres of the cemetery tract is southwest, and goes into a ditch which flows off across the corner of the plaintiff's eighty-acre tract. This witness testified in regard to the wells on plaintiff's lands, which had been respectively numbered, and stated that his survey showed none of these wells would be affected by drainage from the cemetery. Dr. Tucker and Mr. Bair were examined in regard to the survey made by Herring, and each stated that the subsurface water could not reach any of the plaintiff's wells.

The witnesses all agree that the subsurface drainage, where it exists, is in harmony with the surface drainage. A study of the maps made by Herring, as explained by him, greatly weakens the plaintiff's case.

In addition to the testimony of other experts, Dr. Manglesdorf, the State bacteriologist, testified, and he did so after having made observations and experiments with certain test holes which he had excavated on the ten

acres which it is proposed to immediately use for ceme-
tery purposes, as well as certain test wells on the re-
mainder of the land. He was the only bacteriologist who
testified, and as a result of his observation and experi-
ments he expressed the opinion that, in view of the dis-
tance of the wells from the proposed cemetery and the
character of the soil any water which might flow through
the ground to the wells would be filtered, and all bac-
teria and other poisons removed, and that there would
be no contamination to the wells.

The chancellor dismissed the bill as being without
equity, and in our opinion this decree must be affirmed,
as the testimony does not show that probable injury
which must be shown to entitle one to have the location
of a cemetery in his proximity enjoined.